# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2332-20

J.S.,

     Plaintiff-Respondent,

v.

L.M.S.,

     Defendant-Appellant.

_____

Argued March 31, 2022 – Decided August 31, 2022

Before Judges Mitterhoff and Alvarez.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-2071-20.

Rebekah R. Conroy argued the cause for appellant (Stone Conroy LLC, attorney; Rebekah R. Conroy of counsel and on the briefs).

Marc J. Gross argued the cause for respondent (Fox Rothschild LLP, attorneys; Marc J. Gross, of counsel and on the brief; Christine F. Marks, on the brief).

PER CURIAM

Defendant L.M.S., the former wife of plaintiff J.S., appeals from a January 29, 2021 Law Division order denying her motion to dismiss plaintiff's civil claims for damages premised on intentional infliction of emotional distress (IIED) and defamation. The IIED claim arises from defendant's alleged alienation of the affection of the parties' children. We conclude plaintiff's allegations fail to state a viable claim under either cause of action. Accordingly, we reverse.

The genesis of this case is an incident that occurred in July 2017, when the parties' then eight-year-old daughter, S.S., disclosed to her therapist that plaintiff rubbed her vagina. The therapist reported S.S.'s disclosure to the Division of Child Protection and Permanency (DCPP). The agency, in conjunction with the Morris County Prosecutor's Office (MCPO), conducted a brief but thorough investigation during which plaintiff, defendant, S.S., and her two siblings were interviewed. Defendant denied that S.S. had ever disclosed any sexual abuse to her. Plaintiff acknowledged that he had on one occasion rubbed Desitin on S.S.'s genital area because it was itchy and that on a separate occasion, he instructed S.S. to apply the cream herself. S.S. confirmed to several evaluators that her father had rubbed cream on her vagina when she was in the shower and commented it was red. Concluding there was insufficient evidence to establish whether the acknowledged vaginal touching was sexual or

2

caretaking in nature, the MCPO closed the matter and DCPP made a final determination that sexual abuse was "not established."[1]

Prior to, during, and after the resolution of the Title 9 investigation, the parties were engaged in an ongoing FM matter[2] relating to custody, parenting time, and support issues. Plaintiff's parenting time with S.S. was gradually restored with the assistance of therapists to address the family dysfunction.[3] By

---

[1]  Plaintiff appealed the agency's disposition that sexual abuse was "not established" and we agreed the finding was "unfounded" based on our reading of N.J.S.A. 9:6-8.2 and its implementing regulations. See Dep't of Child. and Fams. v. J.S., No. A-1001-17 (App. Div. May 30, 2019). The allegation of sexual abuse being deemed unfounded, however, does not render S.S.'s report of vaginal touching "false." To the contrary, the allegation of touching has irrefutably been established by plaintiff's own admission.

[2]  Docket No. UNN-FM-20-1855-16.

[3]  Continued therapy was recommended by psychologist Sarah Seung-McFarland, Ph.D., who evaluated S.S. during the DCPP investigation. Seung-McFarland diagnosed S.S. with Adjustment Disorder with Anxiety, Parent-Child Relational Problems, and Disruption of Family by Separation or Divorce. Her report concluded:

> With regard to the allegations, this evaluator cannot determine with any degree of psychological certainty whether or not [S.S.] was sexually abused by her father as suggested. Nevertheless, S.S. reported that her father touched her private area, (e.g. toto), while showering, made statements that it is red, and put cream on it more than once. There are also reports that he sees her naked, comes into the bathroom to pee when she is there, and does "raspberries." At the very least, these

3

January 12, 2018, plaintiff's parenting time was fully restored, with the exception of overnights. Overnight parenting resumed on March 16, 2018. Despite the full resolution of his parenting time issues, plaintiff continued to file applications in the FM matter based on defendant's alleged alienation of the children's affection. In support of these applications, in May 2019, he certified to various grievances, gleaned from comments by the children, that defendant denigrated him by referring to him as "Jeff" rather than "papa;" she shared with the children that there was ongoing litigation concerning their religious upbringing; that the food defendant gave them was "bad" and "full of chemicals" because she gave them vegetables from a can; that plaintiff was responsible for 60% of child support because he earned more, and that his current wife was only with him for the money.

In the same certification, plaintiff complained that after a court-ordered mediation to address the children's religious upbringing,[4] defendant would not

> behaviors suggest inappropriate boundaries, and are consistent with reports that [defendant] does not respect the children, is dismissive of them, and treats the twins like babies.

[4] The issues whether defendant had to take the children to Hebrew school during her parenting time and whether she could be prevented from educating them about her Catholic upbrininging were ultimately resolved on appeal. Solar v. Stark, No. A-2156-18 (App. Div. Nov. 6, 2019).

voluntarily agree to a second session to address other disputes including whether defendant should attend parenting classes, whether S.S. should resume therapy, and whether defendant should accede to the request to adjust the parenting drop-off time.  Under the heading "Alienation and Estrangement," plaintiff stated that his son A.S. told him that defendant "interrogated" him about a scratch on his arm and "exerted heavy pressure on him" to suggest plaintiff was somehow responsible for the injury.

Unsatisfied with the results he was getting in the Union County FM matter, plaintiff filed this four-count complaint seeking damages against defendant for intentional infliction of emotional distress (IIED), aiding the commission of a tort, conspiracy, and defamation.[5]  The crux of the IIED claim is set forth on paragraph 17 of the complaint, which alleges:

> As set forth in the various Certifications filed by J.S. in the Family [P]art against [d]efendant and incorporated herein, [d]efendant has engaged in a campaign that was and continues to be destructive to all three . . . of the parties' children, with a focus on S.S., namely [d]efendant's refusal to allow the children to all enjoy overnight parenting time together, objecting

---

[5]  This matter was originally the subject of a complaint filed in July 2018, under Docket No. MRS-1316-18 (the "original complaint").  After an interlocutory appeal in which we reversed the trial court's order denying disqualification of plaintiff's former counsel, the parties agreed to dismiss the original complaint without prejudice, preserving the parties' claims and defenses for period of sixty days, and that plaintiff would file a new complaint.

specifically that S.S. should not have overnight time with J.S. due to the false sexual abuse allegations. . . .

The complaint, read indulgently, reiterates the same grievances that were presented to and resolved with finality by the Union County Family Part. In particular, plaintiff complains that defendant objected to the immediate resumption of overnight parenting despite his misguided belief that the "unfounded" disposition "proved" the touching allegation was utterly false. Plaintiff now asserts, "upon information and belief," that defendant must have "coached" S.S. He also feels "denigrated" by the comments she made about him to the children. Although he has enjoyed full parenting time including overnights since March 2018, he claims to continue to suffer extreme emotional distress based on his fear that defendant will make false allegations in the future.

Defendant filed a motion to dismiss pursuant to R. 4:6-2(e), which the judge denied by order dated January 29, 2021. In his oral opinion, the judge gave his reasons.

> Now, as to the [motion to dismiss], there's no question that the [Segal[6]] case confirms that the intentional infliction of emotional distress is a valid cause of action in a [c]ivil [c]ourt under circumstances like this. I found it interesting that the Appellate Division decision in [Segal], they said, well, she moved and didn't tell him where they were, but for three

---

[6] Segal v. Lynch, 413 N.J. Super. 171 (App. Div. 2010).

months he had no idea where they even were. That doesn't constitute intentional infliction of emotional distress.

Well, the facts are different here. My job is to look at this in accordance with Rule 4:62 and the Printing Mart[7] case. If there are sufficient facts pled, it would require this matter to go further to avoid dismissal at this point to allow the plaintiff to undertake discovery. So that's one.

There are two John Does clients of theories. And I agree with Mr. Gross. Well, let me say, I'm not going to dismiss the application. I -- I'm required to let it go forward. I'm tempted to dismiss the two aiding in the commission of the conspiracy, but I think [plaintiff's counsel] is right. He's -- he's pled John Doe theories. And under the court rule, if somebody else turns up to have conspired with her and aid and abet her, then I guess he can then move to add them specifically. I can't imagine who that would be, but not my place. The point is that he's got a right to maintain at this point those causes of action.

And I know that if he finds nothing -- if he finds that there's no factual basis to confirm that there was somebody in conspiracy or aid and abetting, I know they'll move to withdraw those claims at some point in the future.

Then we come to the defamation claim. It's interesting. The claim -- the specific allegations of defamation that are in the Complaint with the possible exception of one are simply opinion testimony. He's not a good father. I don't have them in front of me so I don't remember. The one that, I guess, could sustain is he revealed I think it was DV information, I guess. If,

_____

[7] Printing Mart–Morristown v. Sharp Electronics Corp., 116 N.J. 739 (1989).

indeed, he went around telling -- if she went around telling people that he's a child abuser, certainly, then I guess defamation occurs so. I can't let that be dismissed either.

So I will grant -- I will not grant the application to dismiss under <u>Printing Mart</u> in 462. I think the plaintiff has pled sufficient facts to assert the recognized causes of action of defamation and intentional infliction of emotional distress.

On appeal, defendant presents the following arguments for our consideration:

POINT I[8]

THE TRIAL COURT ERRED BY FAILING TO APPLY THE STATUTORY IMMUNITY AFFORDED TO INDIVIDUALS COOPERATING WITH DCPP INVESTIGATIONS.

A. New Jersey Provides Immunity to Reports Made to DCPP.

B. Defendant Cooperated with the 2017 DCPP Investigation and Provided Information Requested by the Division.

C. The Reporting Privilege is Absolute.

POINT II

---

[8] Defendant-appellant's Point I is dedicated to the standard of review. Defendant's legal arguments have been renumbered to reflect actual points of argument.

THE TRIAL COURT ERRED IN FAILING TO DISMISS THE COMPLAINT BASED ON THE LITIGATION PRIVILEGE.

A. Statements Made by Defendant in Connection with Pending Litigation Are Subject to the Litigation Privilege.

B. The Law of the Case Doctrine is Not Applicable to [the Law Division judge's] Decision, and in Any Event, [the Law Division judge's] Ruling was Clearly Incorrect.

POINT III

DEFENDANT'S STATEMENTS TO DCPP ARE PROTECTED BY THE CONDITIONAL SPECIAL INTEREST PRIVILEGE.

POINT IV

THE TRIAL COURT ERRED IN FAILING TO FIND THAT STATEMENTS TO DCPP CANNOT BE THE BASIS FOR CIVIL LIABILITY.

POINT V

THE TRIAL COURT ERRING IN REFUSING TO DISMISS THE CASE PURSUANT TO SEGAL V. LYNCH.

POINT VI

THE TRIAL COURT ERRED IN FAILING TO DISMISS COUNT FOUR (DEFAMATION) IN THAT NO ACTIONABLE MISSTATEMENTS OF FACT ARE PLED.

A. The Allegations of Count Four.

B. None of the Statements in Count Four are Actionable.

Our review of a trial court's ruling on a motion to dismiss for failure to state a claim under Rule 4:6–2(e) is de novo. Flinn v. Amboy Nat'l Bank, 436 N.J. Super. 274, 287 (App. Div. 2014). We look to "the complaint to determine whether the allegations suggest a cause of action." In re Reglan Litigation, 226 N.J. 315, 324 n.5 (2016). Assuming the facts stated within the four corners of plaintiff's complaint are true and granting plaintiff the benefit of all rational inferences that can be drawn from such facts, see Green v. Morgan Properties, 215 N.J. 431, 452 (2013) (citation omitted), we must determine whether plaintiff's complaint "suggest[s]" a cause of action. Printing Mart, 116 N.J. at 746 (1989) (citations omitted). Our search must be conducted "in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." Ibid. (citation omitted). Our indulgent review does not, however, require us to disregard facts that have irrefutably been established in related proceedings.

Applying this standard to the allegations in plaintiff's complaint, we are satisfied plaintiff failed to state a prima facie case of intentional infliction of emotional distress.

10

[T]o make out a prima facie case of intentional infliction of emotional distress, plaintiff must show that: (1) defendant acted intentionally; (2) defendant's conduct was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community;" (3) defendant's actions proximately caused him emotional distress; and (4) the emotional distress was "so severe that no reasonable [person] could be expected to endure it."

[Segal, 413 N.J. Super. at 191 (quoting Buckley v. Trenton Sav. Fund Soc., 111 N.J. 355, 366 (1988)).]

As our examination of plaintiff's allegations reveals, the vague inflammatory language in the complaint does not describe the type of conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community[.]" See id. at 192 (quoting Buckley, 111 N.J. at 366). Nor is plaintiff's fear of future misconduct, or his dismay at defendant's refusal to engage in mediation, establish the requisite degree of emotional distress.

In that regard, the trial judge erred in concluding that "there's no question that the [Segal] case confirms that the intentional infliction of emotional distress is a valid cause of action in a Civil Court under circumstances like this." To the contrary, in Segal, we stressed that our parens patriae responsibility empowers us "to intervene to protect children from both physical and emotional harm" that

11

would come from being deposed and placed in the middle of the litigation as key witnesses.  Id. at 188.

> We can plausibly envision such children being deposed about: (1) what mom or dad said; (2) when and how often mom or dad said it; (3) who else was present when they said it; and (4) how did the child feel when mom or dad said it. These depositions will surely be followed or preceded by psychological examinations of the child by experts selected by each side; teachers, counselors, schoolmates, extended family members, and other confidants will also be interrogated and called as witnesses.
>
> In the midst of this litigation tug-of-war will be the children.  After all, liability will be established only if plaintiff can show that the bond and affection that would have otherwise existed between him and the children has been severely compromised by defendant's outrageous and malicious acts.  Thereafter, the measure of damages will depend upon the extent of the injury to that parent/child relationship.  Here again, the children will be featured as the key witnesses.
>
> [Id. at 189-90.]

We concluded that "[e]xtending the tort of [IIED] to this context directly contravenes the principles embodied in the best interests of the child standard." Id. at 190.  Thus, we found that a civil claim for damages in an IIED claim based on alienation of a child's affection is cognizable only in extreme circumstances. In dicta, we theorized,

> we are not blind to scenarios in which one parent intentionally or recklessly imbues a child with such

12

calumnious accounts of the other parent, so wicked in their intent and so destructive in their effect, that the situation necessitates civil redress. For example, a case in which one parent falsely and intentionally accuses the other parent of sexually abusing the child is so despicable on its face and so destructive in its effect on the innocent parent that it cries out for compensation which is not available in the Family Part or even in the criminal courts.

[Id. at 189.]

This case, however, does not present a scenario where defendant "falsely and intentionally accuses the other parent of sexually abusing [S.S.]" Id. at 189. No amount of discovery will alter the fundamental undeniable facts that (1) defendant was not the person who reported J.S. to DCPP, and (2) S.S.'s allegation of vaginal touching by J.S. is true. We will not extend the imposition of liability to a parent who relies on something that has in fact happened to support their position in court whether overnight visitation is appropriate.

Because plaintiff failed to set forth a legally cognizable claim of intentional infliction of emotional distress, his cause of action for conspiracy and aiding the commission of a tort must also fail as a matter of law. See Banco Popular N. Am. v. Gandi, 184 N.J. 161, 177–78 (2005) (holding the "gist" of a claim for civil conspiracy is not the unlawful agreement, but the underlying predicate tort); State, Dep't of Treasury, Div. of Inv. ex rel. McCormac v. Qwest Commc'ns Int'l., Inc., 387 N.J. Super. 469, 484 (App. Div. 2006) (explaining

that a claim for aiding the commission of a tort requires proof of the underlying tort).

Plaintiff's defamation claim is also fatally defective. Our Supreme Court has observed that when alleging defamation "it is not necessary for the complaint to contain a 'verbatim transcription of the words spoken.'" Printing Mart, 116 N.J. at 767 (citing Kotok Bldg. v. Charvine Co., 183 N.J. Super. 101, 105 (Law Div. 1981)). A plaintiff may "'bolster a defamation cause of action through discovery, but not [] file a conclusory complaint to find out if one exists.'" Id. at 768 (quoting Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 101-02 (1986)).

To determine whether a statement has a defamatory meaning, a court considers three factors: "1) the content, 2) the verifiability, and 3) the context of the challenged statement." Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 585 (2009) (quoting DeAngelis v. Hill, 180 N.J. 1, 14 (2004)). Statements of opinion are generally not actionable, as opinions "are generally not capable of proof of truth or falsity because they reflect a person's state of mind." NuWave Inv. Corp. v. Hyman Beck & Co., 432 N.J. Super. 539, 553 (App. Div. 2013). "A statement's verifiability refers to whether it can be proved true or false." Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 167 (1999).

A-2332-20

Paragraph 51 of the Complaint sets forth plaintiff's defamation claims

(Count V), alleging:

> [A]t various times from July 6 2017 through present, J.S. learned that [d]efendant made a barrage of false statements to the Family Court, DCPP, mental health professionals, and, upon information and belief, directly or indirectly to the community at large arising out of the afore-referenced circumstances as follows:
>
> a. That [plaintiff] was not keeping S.S. safe;
>
> b. That [plaintiff] was a peripheral father, not hands on;
>
> c. That [plaintiff] did not know how to deal appropriately with the children;
>
> d. That [plaintiff] had difficulty controlling himself;
>
> e. Assertions that [plaintiff] does not respect the children;
>
> f. Assertions by [d]efendant to the DCPP evaluator that J.S. did "raspberries" on the breasts of S.S.;
>
> g. Assertions by [d]efendant that S.S. did not want to attend her Halloween parade because [plaintiff] would be in attendance;
>
> h. Assertions by [d]efendant that [plaintiff] would not respect boundaries;
>
> i. Assertions by [d]efendant that [plaintiff] has difficulties managing the [three] kids;

j. Assertions by [d]efendant that [plaintiff] intimidates the kids by confronting them;

k. Causing S.S. to make false assertions about a shower incident during the evaluation at the Dorothy Hersh Center;

l. Assertions that [plaintiff] was not a fit parent to S.S.;

m. Assertions that [plaintiff] has a recent history of domestic violence; and

n. Assertions that the children suffer from anxiety by having to spend parenting time with J.S.

[(emphasis added).]

With the exception of paragraphs f, k and n, the remaining paragraphs are all non-actionable statements of opinion. See NuWave, 432 N.J. Super. at 553. Paragraph f specifies that the statement about "raspberries" was made to the DCPP investigator in July 2017, and a claim based on that statement is therefore barred by the litigation privilege. See Hawkins v. Harris, 141 N.J. 207, 216 (1995). Paragraph k is not a statement at all, and to the extent it refers to plaintiff touching S.S.'s vagina, it is not actionable because it is true. With respect to paragraph m, the motion judge found:

> Then we come to the defamation claim. It's interesting. The claim -- the specific allegations of defamation that are in the Complaint with the possible exception of one

16

are simply opinion testimony. ["]He's not a good father.["] I don't have them in front of me to remember. The one that, I guess, could sustain . . . . if she went around telling people that he's a child abuser, certainly, then I guess defamation occurs so. I can't let that one be dismissed either.

We conclude the judge erred in allowing the claim to survive where plaintiff's claim of disclosure to members of the community was based on "information and belief." At oral argument, almost five years after the triggering event, plaintiff was unable to identify with any specificity what defendant said, nor could he identify a single third party to whom anything was allegedly stated. Consequently, we are left to conclude that plaintiff filed this conclusory complaint intending to use discovery to find out if a claim exists. The judge erred in allowing plaintiff's unfounded defamation claim to go forward to enable this impermissible fishing expedition. See Printing Mart, 116 N.J. at 768.

Reversed. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION